UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CIV-61842-RAR

**NOVA SOUTHEASTERN UNIVERSITY, INC.,**
as assignee of DeRose Design Consultants, Inc.,

    Plaintiff,

v.

**CONTINENTAL CASUALTY COMPANY**,

    Defendant.
_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

This case involves an insurance coverage dispute about a construction project gone wrong. Plaintiff Nova Southeastern University ("NSU"), as assignee of DeRose Design Consultants, Inc. ("DeRose"), claims that Defendant Continental Casualty Company ("Continental") breached an insurance contract when it denied coverage for a professional liability claim. Conversely, Continental seeks various declarations that provisions in the relevant policies bar coverage for the claim. The matter is before the Court on NSU's Motion for Partial Summary Judgment [ECF. No. 45] ("NSU Motion") and Continental's Motion for Summary Judgment [ECF No. 52] ("Continental Motion").[1] The Court has carefully reviewed the parties' written submissions, the record, and applicable law. Being otherwise fully advised in the premises, it is hereby

**ORDERED AND ADJUDGED** that NSU's Motion for Partial Summary Judgment is **DENIED** and Continental's Motion for Summary Judgment is **GRANTED** as explained herein.

---

[1] The cross-Motions for Summary Judgment are fully briefed. [ECF Nos. 45-57; 60-61].

## BACKGROUND

**A. The Project**

In the mid-2000's, NSU decided to construct a facility on its campus to provide a "central source of electrical and mechanical services for adjacent buildings" ("Project"). NSU's Statement of Material Facts [ECF No. 46] ("NSU SMF") at ¶ 1; Continental's Statement of Material Facts [ECF No. 51] ("Continental SMF") at ¶ 1. The Project required the construction of large pools, or "ice tanks." The ice tanks would store water to be chilled in the evening and then circulate the chilled water to buildings during the day. In essence, the facility was a more cost-effective and energy efficient way to provide air conditioning. NSU SMF at ¶ 1; Continental SMF at ¶ 2. DeRose was retained to perform the structural engineering services for the project. NSU SMF at ¶ 2; Continental SMF at ¶ 4. NSU hired ANF Group, Inc. ("ANF") to serve as general contractor. Continental SMF at ¶ 5.

The Project experienced problems from the very start. On or about January 26, 2009, ANF conducted a "water test" on one of the ice tanks to determine if the tanks could hold water without leaking. Continental SMF at ¶ 6. Shortly thereafter, DeRose, who designed the ice tanks, was notified that the walls of the ice tank deflected, leaked, and cracked when the tank was filled with water. NSU SMF at ¶ 5; Continental SMF at ¶ 7. DeRose later discovered that the problems with the ice tank were caused by a structural design error. NSU SMF at ¶ 6; Continental SMF at ¶¶ 7-8.

Larry DeRose, DeRose's Senior Vice President, testified that "he wanted to vomit" when he first learned of the structural design error in the ice tank "because the error was so horribly bad." Continental SMF at ¶ 10. Mr. DeRose immediately informed NSU that "no one was to blame but [DeRose] for the structural problem" and that DeRose "accepted full responsibility."

*Id.* at ¶ 12. Mr. DeRose even sought to terminate the employee who was responsible for the error, but the employee offered his resignation before he had the chance. *Id.* at ¶ 11.

### B. The Remedial Design

Mr. DeRose also informed NSU that he would report the incident to his insurance company. *Id.*; NSU SMF at ¶ 5. At the time, DeRose was insured under a claims-made professional liability policy issued by Evanston Insurance Company ("Evanston") for a policy period of March 13, 2008 to March 13, 2009 ("Evanston Policy"). NSU SMF at ¶ 5; Continental SMF at ¶ 13. DeRose reported the structural design error that resulted in the water test failure to Evanston in January 2009. NSU SMF at ¶ 5; Continental SMF at ¶ 14. On or about March 9, 2009, NSU, DeRose, ANF, and Cannon Design Florida Inc. ("Cannon"), the architectural engineers on the project, agreed that the plans to repair the ice tank would be created and issued by DeRose ("Remedial Design"). Continental SMF at ¶ 18. The Remedial Design involved several strengthening repairs, including "removing and replacing the reinforced concrete interior dividing walls with structural steel walls, installing steel plates on the floor and inside of the perimeter walls of the tank structure, and strapping the perimeter walls from the outside face of the tank structure with structural steel beams." *Id.* at ¶ 21. Throughout the course of the Remedial Design, the parties were aware that "corrosion was a potential issue." *Id.* at ¶ 22. Construction on the Remedial Design was completed in July 2009. *Id.* at ¶ 25.

NSU became aware of issues with the Remedial Design as early as October 25, 2009. Specifically, NSU noticed that one of the tanks was leaking and the Remedial Design "showed early indications of corrosion and deterioration of its steel elements." *Id.* at ¶¶ 26-27. In February 2010, NSU commissioned Tank Industries Consultants ("TIC") to conduct a peer review of the tanks after the Remedial Design. *Id.* at ¶ 28. TIC issued its report on March 26, 2010 and issued

a follow-up report on April 23, 2010. *Id.* at ¶¶ 29, 31. The follow-up report indicated that the ice tanks had developed condensation and the coating used on the tanks "did not appear to be designed to protect the steel in the current service condition of continuous condensation." *Id.* After continuing to experience problems with the ice tanks and the Remedial Design, NSU hired Wiss, Janney, Eistner Association, Inc. ("WJE") to conduct a field investigation. *Id.* at ¶ 32. WJE "determined the Remedial Design to be deficient" and confirmed "evidence of corrosion on several elements, which included structural steel elements." *Id.* at ¶ 33.

WJE issued three reports regarding the Project and Remedial Design. The first WJE report, which summarized WJE's findings from the field test, was issued on November 30, 2011. *Id.* at ¶ 34. The second WJE report was issued on January 20, 2012, and summarized WJE's recommendations. *Id.* at ¶ 35. The third WJE report was issued on February 24, 2012 ("Third WJE Report"). *Id.* at ¶ 36. The Third WJE Report concluded that the concrete slab under the ice tanks, which was also designed by DeRose, was "overstressed" and that "elements which cannot be shown to have sufficient capacity to carry the required loads will need additional engineering to design and implement appropriate strengthening repairs." *Id.* at ¶ 36; NSU SMF at ¶ 7.

The Third WJE Report also concluded that the design defects in the concrete slab were "unrelated" to the design defect of the ice tank walls and the Remedial Design. NSU SMF at ¶ 10. In other words, WJE concluded that the concrete slab would not have been able to support the weight of the ice tanks whether the ice tanks had been properly designed or not. *Id.*; Etcheverry Rep. [ECF No. 39] at 3-5.

### C. The Underlying Action

On December 26, 2012, NSU filed suit against DeRose and Cannon in the Circuit Court for the Seventeenth Judicial Circuit in and for Broward County, Florida ("Florida Circuit Court")

styled *Nova Southeastern University v. Cannon Design Florida, Inc. et. al.*, No 12-35481, 2013 WL 12142870 (Fla. 17th Cir. Ct.) ("Underlying Action"). NSU SMF at ¶ 11; Continental SMF at ¶ 38. Therein, NSU asserted a single cause of action against DeRose for professional negligence. Continental SMF at ¶ 39. The professional negligence claim against DeRose specifically noted that DeRose was "negligent in preparing the structural designs for the Project and Remedial Design and failing to exercise that degree and standard of care in performing its professional services with respect to the design and the structural elements of the Project and Remedial Design which a reasonably careful and prudent structural and civil engineer would use under like circumstances." *Id.* The Underlying Action only refers to the Third WJE Report and the problems with the concrete slab in one paragraph of the Factual Background section. *See* Underlying Action [ECF No. 50-1] at ¶ 31.

Evanston defended DeRose in the Underlying Action pursuant to its policy with DeRose. Continental SMF at ¶ 40. On or about November 9, 2015, NSU and DeRose agreed to settle the Underlying Action and Evanston tendered the remaining policy limits towards the settlement. *Id.* at ¶¶ 41-42, NSU SMF at ¶ 14. DeRose also agreed to assign its rights under several other insurance policies to NSU as part of the settlement—including two issued by Continental. *Id.* at ¶ 43; NSU SMF at ¶¶ 4, 14. Finally, on November 8, 2017, a consent judgment was entered in favor of NSU and against DeRose in the amount of $10,500,000 ("Consent Judgment"). NSU SMF at ¶ 15; Continental SMF at ¶ 44.

### D. The Policies

Continental issued Architects/Engineers Program Policy No. 28-836-69-62 to DeRose for the claims-made-and-reported policy term of January 11, 2012 to January 11, 2013 ("First Continental Policy"). NSU SMF at ¶ 3; Continental SMF at ¶ 45. Continental renewed the 2012-

2013 Policy by issuing Architects/Engineers Program Policy No. 28-836-69-62 to DeRose for the claims-made-and-reported policy term of January 11, 2013 to January 11, 2014 ("Second Continental Policy" and, together with the First Continental Policy, "Continental Policies").  NSU SMF at ¶ 3; Continental SMF at ¶ 46.  The Continental Policies provide, in relevant part:

> A. We will pay all amounts in excess of the Deductible up to the Limit of Liability that you become legally obligated to pay as a result of:
>
> 1. a wrongful act, or
>
> 2. a pollution incident arising out of your activities or the activities of any person or entity for whom you are liable,
>
> that results in a claim anywhere in the world, **provided that on the Knowledge Date set forth in Item 4. on the Declarations, none of your officers, directors, principals, partners, or insurance managers knew of any act, error, omission, or event that could reasonably be expected to become the basis of that claim.**

Continental SMF at ¶ 47 (emphasis added).  The Continental Policies contain a January 11, 2012 Knowledge Date.  NSU SMF at ¶ 3; Continental SMF at ¶ 48.

The Continental Policies define a "claim" as "a demand for money or services, naming you and alleging a wrongful act[2] or pollution incident."  Continental SMF at ¶ 49.  Importantly, the Continental Policies provide that "[a]ll related claims shall be considered a single claim first made and reported to us within the policy year in which the earliest of the related claims was first made and reported to us."  *Id.* at ¶ 51.  The Continental Policies go on to define a "related claim" as follows:

> all claims made against you and reported to us during any policy year arising out of:
>
> 1. a single wrongful act; [or]

---

[2] The Continental Policies define "wrongful act" as "an error, omission, or other act that causes liability in the performance of professional services for others by you or any person or entity, including joint ventures, for whom you are liable…"  Continental SMF at ¶ 50.

> 2. multiple wrongful acts that are logically or causally connected by any common fact, situation, transaction, advice, or decision . . ..

*Id.* at ¶ 52. The Continental Policies also contain a Prior Notice Exclusion providing that:

> We will not defend or pay under this Policy for any claim: . . .
>
> K. arising out of:
>
> 1. any wrongful act, pollution incident, or any matter, fact, situation, transaction, or event, for which notice was given by you under any professional liability or pollution insurance coverage prior to the effective date of this Policy; or
>
> 2. any other wrongful act or pollution incident whenever occurring, which is logically or causally connected by any common fact, situation, transaction, or event to the wrongful act or pollution incident specified in K.1. above.

*Id.* at ¶ 53.

### E. Coverage of the Underlying Action Under the Continental Policies

NSU forwarded the Third WJE Report, which chronicled the structural defects with the concrete slab, to DeRose on October 25, 2012. NSU SMF at ¶ 7. DeRose reported the structural defects in the concrete slab to Continental through its insurance broker, Specialty Brokerage Services ("SBS"), on November 12, 2012.[3] NSU SMF at ¶ 8; Continental SMF at ¶ 54. SBS' November 12th email noted that the email was being sent "as information only" and confirmed that "[t]he claim still belongs to Evanston and it has been reported to them, but we wanted to make [Continental] aware of the situation." Continental SMF at ¶ 55. On January 10, 2013, SBS

---

[3] NSU argues that SBS was not acting as DeRose's insurance broker, and consequently DeRose's agent, when it communicated with Continental regarding the Underlying Action. NSU states that Continental has failed to set forth facts that the agency relationship between DeRose and SBS extended beyond the procurement of insurance. *See* NSU Resp. [ECF No. 56] at 6. However, NSU itself presented evidence that SBS was acting as agent for DeRose when it communicated with Continental regarding the Underlying Action. *See* NSU SMF at ¶ 4; DeRose Aff. [ECF No. 4] at ¶ 10 ("On or about November 12, 2012, I forwarded NSU's Notice of Claim *to my insurance broker to provide notice of the claim to Continental.*") (emphasis added).

tendered the Complaint in the Underlying Action to Continental. *Id.* at ¶ 56. SBS was clear, once again, that the notice was being provided for "information only" and stated "[a]gain this was reported to Evanston as we feel the claim belongs to them, but can you please let [Continental] know." *Id.* at ¶ 57. On January 14, 2013, Continental issued a letter to DeRose denying coverage for the Underlying Action. NSU SMF at ¶ 12; Continental SMF at ¶ 58.

NSU filed suit against Continental in the Florida Circuit Court on July 10, 2018. Continental timely removed the action to this Court on August 8, 2018. *See* Not. of Removal [ECF No. 1]. NSU then filed an Amended Complaint asserting one count of Breach of Insurance Contract against Continental. Am. Compl. [ECF No. 19]. The Amended Complaint avers that "Continental breached the insurance contract by denying coverage and refusing to pay damages associated with NSU's *claim* against DeRose resulting in a judgment being entered against DeRose." *Id.* at ¶ 25 (emphasis added). Continental filed an Amended Counterclaim against NSU seeking various declarations that provisions of the Continental Policies preclude coverage of the Underlying Action. *See* Am. Countercl. [ECF No. 24]. On June 21, 2019, the parties filed a Joint Motion to Vacate Trial Date and Pretrial Deadlines, which the Court granted, asserting that "the Parties have reached an agreement under which this case will be fully resolved by the Court's ruling on the pending cross-motions for summary judgment, regardless of how the Court rules on those motions." Mot. to Vacate [ECF No. 64] at 1.

## LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this assessment, the Court "must view all the evidence

and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citation omitted), and "must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990) (citation omitted).

The movant's initial burden on a motion for summary judgment "consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (alterations and internal quotation marks omitted) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party has shouldered its initial burden, the burden shifts to the non-moving party to "demonstrate the existence of evidence that would support a verdict in its favor." *Id.* (citing *Celotex*, 477 U.S. at 322-23). "[I]f reasonable minds might differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Id.* (quoting *Washington v. Dugger*, 860 F.2d 1018, 1020 (11th Cir.1988)) (internal citations omitted).

A district court's disposition of cross-motions for summary judgment employs the same legal standards as when only one party files a motion. *Am. Cas. Co. of Reading v. Belcher*, No. 16-CV-80074, 2017 WL 372094, at *6 (S.D. Fla. Jan. 26, 2017), *aff'd sub nom. Am. Cas. Co. of Reading v. Belcher*, 709 F. App'x 606 (11th Cir. 2017) (internal citations omitted). A court must consider each motion on its own merits, "resolving all reasonable inferences against the party whose motion is under consideration." *Id.* (quoting *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1243 (N.D. Ga. 2014)) (citing *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331

(11th Cir. 2005)). "Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts." *Belcher*, 2017 WL 372094, at *6 (internal citations omitted).

The parties agree that the relevant provisions in the Continental Policies are unambiguous and that Florida law governs this case. Under Florida law, "the interpretation of provisions in an insurance contract is a question of law…" *Stephens v. Mid-Continent Cas. Co.,* 749 F.3d 1318, 1321 (11th Cir. 2014) (internal citations omitted). Moreover, "insurance contracts are construed according to their plain meaning." *Reading*, 709 F. App'x at 609 (quoting *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005)) (internal citations omitted). "'[I]f a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision.'" *Taurus Holdings*, 913 So. 2d at 532 (quoting *Hagen v. Aetna Cas. & Sur. Co*., 675 So. 2d 963, 965 (Fla. 5th DCA 1996)).

## ANALYSIS

The essential disagreement in this case centers around the definition of the word "claim." Continental argues that the "claim" at issue is the Underlying Action. NSU, on the other hand, argues that the "claim" is the October 25, 2012 Notice of Claim regarding defects in the concrete slab. Once the Court settles this threshold question, it must then apply the unambiguous language of the Continental Policies to determine if coverage should be afforded. Specifically, the Court is tasked with determining whether the Prior Knowledge Condition or the Prior Notice Exclusion in the Continental Policies bar coverage for the "claim" at issue.

### I. The Underlying Action is the relevant "claim."

The Continental Polices at issue in this case are "claims-made" policies. NSU Mot. at 6-7. A claims-made policy is a policy "wherein the coverage is effective if the negligent or omitted

act is discovered and brought to the attention of the insurer within the policy term." *Gulf Ins. Co. v. Dolan, Fertig & Curtis*, 433 So. 2d 512, 514 (Fla. 1983) (internal citations omitted). "The essence, then, of a claims-made policy is notice to the carrier within the policy period." *Id.* Here, Continental argues that the "claim" for which it properly denied coverage was the Underlying Action. *See* Continental Resp. [ECF No. 54] at 3-4.

In opposition, NSU notes that DeRose made three separate and distinct errors related to the Project: (1) the calculation error in the design of the ice tank walls; (2) the failure to consider corrosion issues in the Remedial Design; and (3) the design error in the concrete slab. NSU Resp. [ECF No. 56] at 1-2. It is the third error in particular that NSU maintains must be covered—what NSU has termed the "Slab Claim" as specified in its Notice of Claim issued by counsel for NSU on October 25, 2012. *Id.* at 5. NSU argues that Continental should cover the Slab Claim because DeRose discovered and reported it during Continental's coverage period and it is "separate and distinct" from the other errors in the Project. NSU Mot. at 3.

However, while NSU may be correct in identifying three distinct errors made by DeRose, the text of the Continental Policies makes clear that the errors are all part of a single "claim." The Continental Policies define a "claim" as "a demand for money or services, naming you and alleging a wrongful act or pollution incident." Continental SMF at ¶ 49. Here, the Notice of Claim does not make a demand for money or services from DeRose. *See* Not. of Claim [ECF No. 50-17] at 60-63. Indeed, the cases cited by NSU cut against their characterization of the Notice of Claim for the concrete slab as a separate "claim." *See Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1264 (11th Cir. 2000) (considering almost identical policy language under Florida law and concluding that various "wrongful acts" that are "related" as defined in the policy constitute one "claim" pursuant to the policy). And to the extent NSU relies on the Notice of Claim itself to establish a

distinct "claim" regarding defects in the concrete slab, the Notice of Claim is merely a required notice pursuant to section 558.004 of the Florida Statutes, which specifically states that "the providing of a copy of such notice to the person's insurer, if applicable, *shall not constitute a claim* for insurance purposes unless the terms of the policy specify otherwise." Fla. Stat. § 558.004(13) (2019) (emphasis added).

Moreover, even if each discrete error committed by DeRose were considered a separate "claim," the Continental Policies provide that "[a]ll related claims shall be considered a single claim first made and reported to us within the policy year in which the earliest of the related claims was first made and reported to us." Continental SMF at ¶ 51. "Related Claims" are defined as:

> all claims made against you and reported to us during any policy year arising out of:
>
> 1. a single wrongful act; [or]
>
> 2. multiple wrongful acts that are *logically or causally connected by any* common fact, situation, transaction, advice, or decision. . ..

*Id.* at ¶ 52 (emphasis added). NSU argues that the Slab Claim is not a "related claim" based upon its expert's unrebutted opinion that the errors are "unrelated." NSU Mot. at 9-12. NSU also posits that for the Slab Claim to be "logically connected" to the defects in the ice tank and the Remedial Design, "the same or substantially similar transgression (wrongful act) must be repeated in a nearly identical form." *Id.* (citing *Belcher*, 709 F. App'x at 609).[4]  These arguments, however, cannot overcome the plain language of the Continental Policies.

NSU's expert report concluding that the Slab Claim was "unrelated" to the defects in the ice tank and the Remedial Design spoke only to the *causal* relationship between the errors. *See*

---

[4] NSU also argues that the "related claims" definition in the Continental Policies does not apply because the term "is only used in the Policies in relation to limitations on liability." NSU Mot. at 12. However, NSU cites no authority in support of this position. Further, cases cited by NSU in its Response to Continental's Motion flatly contradict this argument. *See* NSU Resp. [ECF No. 56] at 5 (citing *Wendt*, 205 F.3d at 1263; *Pacific Employers Ins. Co. of Los Angeles v. Ott.*, 545 So. 2d 462 (Fla. 3d DCA 1989)).

NSU SMF at ¶ 10.  In other words, NSU's expert concluded that the concrete slab would not have been able to support the weight of the ice tanks whether the ice tanks had been properly designed or not.  *Id.*; Etcheverry Rep. [ECF No. 39] at 3-5.  While this unrebutted report serves to establish that the defect in the slab was not "causally connected" to the defects in the ice tank and Remedial Design, it says nothing about whether these errors are "logically connected."

As for NSU's attempt to circumvent the Continental Policies' "logically connected" language, *Belcher* does not stand for the proposition that "the same or substantially similar transgression must be repeated in a nearly identical form" for two wrongful acts to be "logically connected."  Rather, the Eleventh Circuit, analyzing substantially similar policy language under Florida law, held that the relevant inquiry is whether there are *any* common facts or circumstances between the claims—not whether there are any differences.  *Belcher*, 709 F. App'x at 609 ("Acts, errors, or omissions are related under the policy if they are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision.") (internal quotations omitted).  Further, courts have held that for claims or acts to be "logically connected," all that is required is some "factual nexus."  *See Wendt*, 205 F.3d at 1258 (concluding that two claims arose out of wrongful acts that were logically connected to each other because they arose out of the same or a related "course of conduct"); *Vozzcom, Inc. v. Great Am. Ins. Co. of N.Y.*, 666 F. Supp. 2d 1332, 1339 (S.D. Fla. 2009) (recognizing the "extremely broad" nature of the language at issue under the policy and explaining that analyzing the "relatedness" of claims under such language "does not require exact factual overlap, or even identical legal causes of action, but rather focuses simply on whether the claims are logically linked by a sufficient factual nexus.") (quoting *Capital Growth Financial LLC v. Quanta Specialty Lines Ins. Co*., No. 07-80908-CIV, 2008 WL 2949492, at *4 (S.D. Fla. July 30, 2008)).

In light of the aforementioned case law, to the extent NSU's claims against DeRose constitute three different claims, those claims are "related claims" and must therefore be treated as a single "claim" under the Continental Policies. DeRose was responsible for the design flaws in the ice tank, the Remedial Design, and the concrete slab. The ice tanks and concrete slab were designed and constructed by the same firm as part of the same Project. One would not exist without the other. While the Court does not find that the errors are causally connected, a sufficient factual nexus exists to conclude that the errors are "logically connected" and part of the same course of conduct. As such, the Court finds that the "claim" at issue is the Underlying Action.[5]

**II. The Continental Policies bar coverage of the Underlying Action.**

It is undisputed that the Underlying Action was filed on December 26, 2012, which is within the applicable Continental Policy period. NSU SMF at ¶ 11; Continental SMF at ¶ 38. Therefore, given that the Court has concluded that the Underlying Action is the "claim" at issue, the Court must now turn to the unambiguous language of the Continental Policies to determine whether coverage must be afforded. Continental maintains that two policy provisions separately and independently bar coverage of the Underlying Action: the Prior Knowledge Condition and the Prior Notice Exclusion. The Court addresses each provision in turn.

### *i. The Prior Knowledge Condition bars coverage of the Underlying Action.*

The Continental Policies contain a Prior Knowledge Condition that provides that coverage is only available for a claim if, before the January 11, 2012 inception date of the First Continental

---

[5] This conclusion is bolstered by the text of the Complaint in the Underlying Action, which asserted a single cause of action against DeRose for professional negligence. Continental SMF at ¶ 39. The professional negligence claim specifically noted that DeRose was "negligent in preparing the structural designs for the *Project and Remedial Design* and failing to exercise that degree and standard of care in performing its professional services with respect to the design and the structural elements of the *Project and Remedial Design* which a reasonably careful and prudent structural and civil engineer would use under like circumstances." *Id.* (emphasis added). In fact, the Underlying Action only refers to the Slab Claim in one paragraph of the Factual Background section. *See* Underlying Action [ECF No. 50-1] at ¶ 31.

Policy, none of DeRose's officers, directors, principals, partners, or insurance managers knew of any act, error, omission, or event that could reasonably be expected to give rise to that claim. Continental SMF at ¶ 47. Here, DeRose knew, or should have reasonably expected, that a claim could arise related to the negligent design of the Project as far back as January 2009. *See* NSU SMF at ¶ 5; Continental SMF at ¶ 14.

Florida courts "routinely affirm the denial of coverage where an insurance policy contains an unambiguous 'prior knowledge' provision and where an insured has knowledge, prior to the effective date of the policy, of acts or omissions that might reasonably provide the basis for a claim." *Eddy v. Cont'l Cas. Co.*, 784 F. Supp. 2d 1331, 1337 (M.D. Fla. 2011) (citing *Lawyers Prof'l Liab. Ins. Co. v. Dolan, Fertig & Curtis*, 524 So. 2d 677, 678 (Fla. 4th DCA 1988)) (holding prior knowledge provision clearly and unambiguously barred coverage for claim of which insureds were aware before policy's effective date). Under the Continental Policies, the Prior Knowledge Condition is triggered if DeRose actually knew that a wrongful act might be the basis of a claim, or based on the facts subjectively known by DeRose, a reasonable insured could have foreseen that a claim might result. *See, e.g., David R. Farbstein, Pa. v. Westport Ins. Co.*, No. 16-cv-62361, 2017 WL 3425327, at *7 (S.D. Fla. Aug. 9, 2017).

Here, DeRose knew (or should have known) that a wrongful act may have become the basis of a claim as far back as January 2009 when it reported the error to Evanston. NSU SMF at ¶ 5; Continental SMF at ¶ 14. Moreover, the reports on the Remedial Design, commissioned by NSU and released in April 2010 and November 2011, reported even more structural design problems caused by DeRose. Continental SMF at ¶¶ 31, 34. NSU argues that DeRose did not expect, and did not have any reason to expect, that NSU would make the Slab Claim until the Third WJE

Report.[6]  NSU Mot. at 8.  But in doing so, NSU confuses the definition of "wrongful act" with the definition of "claim" under the Continental Policies.  Although NSU did not bring the Underlying Action until after it discovered the issues with the slab (and the First Continental Policy was in force), the "claim" is the Underlying Action.  The Underlying Action clearly seeks to recover for the "wrongful acts" related to the ice tanks, the Remedial Design, and the slab.  Since DeRose knew, or should have known, that the negligent design of the ice tanks or the Remedial Design might have become the basis for the claim prior to January 11, 2012, the Prior Knowledge Condition in the Continental Policies bars coverage of the Underlying Action.

### ii. *The Prior Notice Exclusion bars coverage of the Underlying Action.*

The Prior Notice Exclusion provides a separate and independent basis for Continental to deny coverage for the Underlying Action.  Under the Prior Notice Exclusion, there is no coverage for claims

> K. arising out of:
>
> 1. any wrongful act, pollution incident, or any matter, fact, situation, transaction, or event, for which notice was given by you under any professional liability or pollution insurance coverage prior to the effective date of this Policy; or
>
> 2. any other wrongful act or pollution incident whenever occurring, which is logically or causally connected by any common fact, situation, transaction, or event to the wrongful act or pollution incident specified in K.1. above.

---

[6] NSU also relies on the Affidavit of Larry DeRose, which states that "[d]espite the errors found in the design of the ice tank walls, there was no reason to believe (and I did not believe) that any other aspect of DeRose's design on the Project was deficient or erroneous."  DeRose Aff. at ¶ 5.  This evidence has no probative value.  Self-serving, conclusory affidavits are generally insufficient in opposing summary judgment.  *See, e.g., Smith v. Young*, No. 4:11 cv573-RH/CAS, 2013 WL 1729000, at *12 (N.D. Fla. Mar. 6, 2013) ("[O]ne cannot oppose summary judgment with a self-serving, conclusory affidavit that fails to set forth specific facts to show why there is an issue for trial, and fails to demonstrate that the facts presented in the affidavit are based on personal knowledge beyond mere speculation or belief."); *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value.").

Continental SMF at ¶ 53. Under Florida law, "arising out of" means "'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to' or 'having a connection with.'" *Belcher*, 709 F. App'x. 609 (quoting *Taurus Holdings*, 913 So. 2d at 539). The term "requires more than mere coincidence" between the conduct and the injury, but it does not require proximate causation. *Id.*

Here, it is undisputed that DeRose reported issues (i.e., the "wrongful acts") that were the subject of the Underlying Action (i.e., the "claim") to Evanston as early as January 2009. Thus, it follows that the Underlying Action has "a connection with" or "is incident to" and "arises out of" a wrongful act for which notice was provided to an insurer prior to the effective date of the Continental Policies. Consequently, coverage is barred under Section K.1 of the Prior Notice Exclusion.

Even if the Underlying Action did not "arise" from the defects in the ice tanks, the second prong of the Prior Notice Exclusion surely bars coverage. The second prong of the Prior Notice Exclusion bars coverage for claims arising out of wrongful acts, whenever occurring, that are either logically or causally connected to a wrongful act that was reported to a prior insurer. As explained, the issues with the slab are "logically connected" to the issues with the Project as a whole. *See* Sec. I. Thus, the Underlying Action is, at a minimum, a claim arising out of wrongful acts that are logically connected to a wrongful act that was reported to a prior insurer. Consequently, coverage for the Underlying Action is barred by the Prior Notice Exclusion in the Continental Policies.

## CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED AND ADJUDGED** that NSU's Motion for Partial Summary Judgment [**ECF No. 45**] is **DENIED** and Continental's Motion for Summary Judgment [**ECF No. 52**] is

**GRANTED**.  A judgment will be entered in accordance with the foregoing by separate order.

**DONE AND ORDERED** in Ft. Lauderdale, Florida, this 27th day of December, 2019.

_____
**RODOLFO RUIZ**
**UNITED STATES DISTRICT JUDGE**

cc: Counsel of record